James Mitchell BEVILL, Appellant,

v.

STATE of Indiana, Appellee.

No. 483 S 149.

Supreme Court of Indiana.

Jan. 10, 1985.

Rehearing Denied March 13, 1985.

Lee J. Christakis, Gary, for appellant.

Linley E. Pearson, Atty. Gen., G. Douglas Seidman, Deputy Atty. Gen., Indianapolis, for appellee.

DeBRULER, Justice.

This is a direct appeal from convictions of attempted murder, a class A felony, Ind.Code §§ 35–42–1–1 and 35–41–5–1; burglary, a class A felony, Ind.Code § 35–43–2–1, and burglary, a class B felony, Ind.Code § 35–43–2–1. Appellant filed a notice of defense of insanity. The case was tried by a jury. Appellant was sentenced to two concurrent thirty year terms on the two class A felonies and a ten year consecutive term on the class B felony.

Appellant raises four issues on appeal: (1) whether the trial court erred in denying his motion to suppress evidence of inculpatory statements made by him, (2) whether he had effective assistance of counsel (3) whether the evidence adduced at trial was sufficient to support his conviction for attempted murder; (4) whether his conviction and sentencing for both attempted murder and class A burglary amounts to a violation of his constitutional right not to be put in double jeopardy.

These are the facts which tend to support the determination of guilt. On January 7, 1982, Lucy Brown arrived at her house at approximately 8:15 P.M. When she entered the house, she saw a light on in the back bedroom. She called her son's name, and, as she approached the bedroom, a young man confronted her and brandished a knife. She backed away and escaped out the back door. She ran toward her next door neighbor's house and slipped and fell on the ice. The young man caught up with her and stabbed her twenty-seven times. She fought, and he stopped the attack and ran back into the house. She pulled herself up off the ground and went to her neighbor's house for help.

Later, she gave a description of her assailant to the police. Also, the police discovered that the glass on the back door had been broken and that the steel mesh had been pushed away. Also, a brown suede right hand glove, a watch, and a pair of eyeglasses were discovered.

At midnight that same evening, Walter Wozniak returned to his home. He discovered that his house had been broken into and that his .38 caliber semi-automatic pistol was missing from beneath his mattress.

Based on the evidence gathered, Detective Summers went to the home of appellant's parents. The Detective obtained several items of appellant's clothing, including a brown suede left hand glove.

On January 9, 1982, appellant was arrested. A .38 caliber semi-automatic pistol was found in his possession. Wozniak identified the pistol as his.

Detective Summers and Moulesong questioned appellant. Before the questioning commenced, they read and explained to him his rights; and, as a result, he read and signed a waiver of rights form. They talked to him for an hour, from 12:50 a.m. to 1:50 a.m.

He admitted being in Lucy Brown's driveway, but he denied committing the crime. He did, however, admit to picking up the knife beside her and running away with it. When the detectives attempted to find out more about the knife, he became evasive and nervous; consequently, they ended the session. The next afternoon appellant requested to talk to the detectives. He signed another waiver of rights form. This second session lasted almost two hours, and he confessed to breaking into Lucy Brown's house and to holding a knife over her in the driveway. He also confessed to breaking into Wozniak's house. At the end of the conversation, he refused to sign a written statement of his story because he claimed that the detectives had changed what he had said.

At trial, three psychiatrists testified that they had examined him and found him to be sane at the time he committed the crime.

## I

Appellant claims the trial court erred when it denied his motion to suppress his inculpatory statements to the police. He also argues that it was error to admit over objection such statements at trial.

■ It is the State's burden to prove beyond a reasonable doubt, that the defendant voluntarily and intelligently waived his rights, and that the defendant's confession was voluntarily given. *Shepler v. State* (1980), Ind., 412 N.E.2d 62; *Jackson v. State* (1980), 274 Ind. 297, 411 N.E.2d 609. Upon a review of the denial of a motion to suppress a confession and the subsequent admission of that confession over objection, this Court will not weigh the evidence nor judge the credibility of witnesses. The admissibility of a confession ultimately depends upon questions of fact which are to be resolved by the trial court. The ruling that a statement given by the accused during custody and interrogation is admissible will be affirmed where there is substantial evidence of probative value from which a rational trier of fact could infer beyond a reasonable doubt that the required free, voluntary and knowing action on the part of the accused took place. *Magley v. State* (1975), 263 Ind. 618, 335 N.E.2d 811.

At the hearing on the motion to suppress, Officer Moulesong referred to two interrogation sessions with the appellant. At the first session which occurred approximately one hour after appellant was arrested, Moulesong testified that he read appellant his rights from a waiver of rights form and that appellant read the form himself. Moulesong then testified that appellant signed the waiver of rights form. The second session occurred approximately fourteen hours later. Appellant requested to talk to Detectives Moulesong and Summers. Moulesong testified that appellant signed another waiver of rights form and that it was executed in the same manner as the first. It was in this second session that appellant gave the most incriminating details of his participation in the crime and revealed the location of the knife used to stab Lucy Brown. Appellant admitted at the motion to suppress hearing that he signed the waiver of rights forms and that he had spoken voluntarily with the officers.

■ In spite of these admissions, appellant claims that his statements were not voluntarily given because of his refusal to sign a written statement of his confession drafted by the detectives. Appellant explained his refusal to sign a written statement in response to this question:

Q. Why didn't you give a written statement, only a verbal statement?

A. When they talked to me, I tell them one thing, and they were changing my words.

Appellant's response indicated that he was concerned with the accuracy of the content of his story as retold by the officers. This concern does not indicate a misunderstanding of the consequences of his prior choice to forego his rights. Rather, a desire that one's statement be reported accurately creates the inference that the choice to give the statement was the product of free, voluntary and knowing action.

■ We find that the evidence sufficiently supported the inference of a free, voluntary and intelligent waiver of rights before both statements were made to the police and that the statements themselves were likewise freely and voluntarily given. It was not error to permit their introduction into the evidence.

## II

Appellant argues that his trial counsel's assistance was ineffective. Appellant bases this claim on nine alleged errors that indicate his counsel's ineffectiveness: (1) that counsel waived the opening statement; (2) that counsel failed to object to seventeen of the State's exhibits; (3) that counsel did not move for a directed verdict; (4) that counsel did not move for a judgment on the evidence; (5) that counsel filed a deficient Belated Motion to Correct Errors; (6) that counsel failed to cross-examine witnesses, Fielden and Klasner; (7) that counsel insufficiently cross-examined Michael Wozniak; (8) that counsel permitted appellant to testify despite an insanity defense; and (9) that counsel offered no witness in support of appellant's insanity defense.

■ These guidelines are to be followed when reviewing ineffective assistance claims.

## THE STANDARD OF COMPETENCY:

"The proper standard for attorney performance is that of reasonably effective assistance." *Strickland v. Washington* (1984), — U.S. —, 104 S.Ct. 2052, 80 L.Ed.2d 674.

## THE PRESUMPTION OF COMPETENCY:

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance, after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. *Engle v. Isaac* (1982), 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' *Strickland, supra* [104 S.Ct.] at 2065.

## THE TWO PART STANDARD OF REVIEW:

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient-performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the

result unreliable. *Strickland, supra* [104 S.Ct.] at 2064.

*King v. State* (1984), Ind., 467 N.E.2d 726; *Elliott v. State* (1984), Ind., 465 N.E.2d 707.

■ Appellant's first premise is that counsel's tactical decision to waive opening argument was negligent. Appellant tendered a defense of insanity. The preliminary instructions to the jury addressed the ramifications of the defense in a formal manner. The tendering of the defense does not relieve the prosecution from presenting proof of conduct which would be violative of the substantive statute. Counsel's decision could be reasonably based upon a tactical decision against reaffirming or restating the admission of conduct aspect of the defense in informal language before the prosecution actually mustered and presented a *prima facie* case. The decision was not deficient.

■ Appellant's second premise is that counsel was negligent in failing to object to State's exhibits which portrayed the crime scene or contained material evidence connecting appellant to the crime. The decision to not make perfunctory objections having little chance of success or no direct and substantial relationship to the main position of the defense is within the realm of reasonable trial strategy. Such objections are subject to being viewed by the court and jury as reflecting pettiness and weakness.

■ Appellant's third and fourth premise relate to counsel's failure to make a motion at the end of the State's case and at the end of all of the evidence, for a judgment on the evidence. There was no prejudice to the defense here, since the evidence was clearly sufficient to establish a *prima facie* case. The trial court may enter a judgment on the evidence on its own motion pursuant to T.P. 50(A)(6), and the issue of sufficiency of evidence may be raised on appeal for the first time without such a motion at trial.

■ Appellant's fifth premise is that counsel filed a deficient Belated Motion to

Correct Errors. Assuming this to be true, there is no prejudice since replacement counsel was allowed to file another Belated Motion to Correct Errors which preserved all valid issues for appeal.

■ Appellant's sixth premise is that counsel's decision not to cross-examine Fielden and Klasner was deficient. Fielden was a police officer who was assigned to the bureau of identification. At trial, Fielden introduced the photograph of the wounded victim into evidence. Klasner was a police officer who was assigned to the crime laboratory. At trial, Klasner described the evidence collected at the crime scene, and he introduced several of the State's exhibits into evidence, including appellant's wristwatch, gloves and eyeglasses. The testimony of Fielden and Klasner centered on the identity of the victim and appellant's presence and participation in the offense. Again, appellant did not contest these issues; consequently, the decision not to cross-examine Fielden and Klasner was sound trial strategy.

■ Appellant's seventh premise is that counsel insufficiently cross-examined Wozniak, who testified about the break-in of his house and the theft of his .38 caliber gun. On cross-examination counsel questioned Wozniak about the proximity of his house to Brown's house. Appellant has not shown us how counsel's cross-examination was deficient. He merely complains that counsel's cross-examination consisted of only three questions. Without more, we cannot say that counsel's cross-examination was deficient.

■ Appellant's eighth premise is that counsel permitted appellant to testify despite an insanity defense. Counsel questioned appellant extensively about his history of drug abuse and its relationship to his prior crimes. Then, counsel brought out that appellant had taken eight librium tablets and had smoked eight marijuana cigarettes just prior to the time of the offense. Counsel's purpose in eliciting this testimony was to attempt to establish that appellant was not responsible for his actions

because of the effect of the narcotics on his capacity to form the required intent for the crime. Although having a defendant testify at trial is usually poor strategy, under the circumstances here counsel's decision to have appellant testify was not deficient. The trial court had already heard from two psychiatrists, both of whom testified that appellant was sane at the time of the crime; therefore, it was necessary for counsel to bring out appellant's history of drug addiction and recollection of the events surrounding the crime in order to reinforce the testimony elicited from Dr. Periolat on cross-examination.

■ Appellant's ninth premise is that counsel offered no witnesses in support of his insanity defense. Other than the appellant himself, counsel offered no witnesses in support of the insanity defense. The trial court, however, had two psychiatrists testify as to appellant's mental condition at the time of the crime. Both psychiatrists testified that appellant was sane at the time of the crime. Counsel, however, in support of his theory, elicited testimony on cross-examination from Dr. Periolat that a history of drug abuse could cause mental disease or defect and that drug induced intoxication could prevent a person from conforming his conduct to the standards of the law. Also, counsel elicited testimony from Lucy Brown that appellant was scared, weird looking, berserk and that his eyes were big. Counsel's presentation of the insanity defense was sound and the fact that he offered only one witness in support of the defense does not render it deficient.

■ We find that trial counsel's assistance was reasonably effective.

### III

■ Appellant argues that the evidence adduced at trial was insufficient to support his convictions on count I for attempted murder. The appellate court will not weigh the evidence nor judge the credibility of the witnesses. Rather, an appellate court considers only that evidence most favorable to the State and all reasonable inferences to be drawn therefrom which support the verdict. If there is substantial evidence of probative value which would permit a reasonable trier of fact to find the existence of each element of the offense beyond a reasonable doubt the judgment must be affirmed. *Reed v. State* (1979), 180 Ind.App. 5, 387 N.E.2d 82; see also *Henderson v. State* (1980), 273 Ind. 334, 403 N.E.2d 1088.

■ The evidence recited above is more than sufficient to support the conviction for attempted murder.

### IV

Based upon the prohibitions of the Indiana Constitution, Article 1, § 14, and the Fifth Amendment of the U.S. Constitution against multiple punishments for the same offense, *North Carolina v. Pearce* (1969), 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656, *Thompson v. State* (1973), 259 Ind. 587, 290 N.E.2d 724, appellant next contends that his convictions and sentences for both attempted murder under Count I, and class A burglary under Count II, cannot stand. He argues that it is impermissible to use the evidence of the stabbing of the victim to satisfy the element of bodily injury for class A burglary and to satisfy the substantial step element for attempted murder.

Count II contained the allegations that appellant broke and entered the structure of Lucy Brown with the intent to steal, that he was then armed with a knife, and that he unlawfully and feloniously inflicted bodily injury upon Lucy Brown. Count I contained allegations that appellant did attempt to kill Lucy Brown by touching, striking, cutting and stabbing her with a knife. According to the burglary statute, the defined offense is elevated to a class A felony, where it ".. results in either bodily injury or serious bodily injury to any person.." Ind.Code § 35–43–2–1. The employment of the term "inflict" here constitutes a reference to those impairments of Lucy Brown resulting directly by application of his hand. The proof showed no

impairments at appellant's hand except those occurring when he stabbed her. The conclusion is therefore unavoidable, and consonant with appellant's claim, that the attempted murder charge, and the burglary charge to the extent that it includes the added element of resultant bodily injury, are based upon and seek punishment for the same stabbing and the same injurious consequences to the same person.

■ It has long been the law that convictions and sentences for both a felony murder and an intentional murder cannot stand where an injury is intentionally inflicted in the course of a felony and results in a single death. *Bean v. State* (1978), 267 Ind. 528, 371 N.E.2d 713. One of the most fundamental principles of criminal law is that a person may not be twice punished for a single offense arising from one set of operative circumstances. *Haggard v. State* (1983), Ind., 445 N.E.2d 969. The problem in the case at bar is analogous to the one presented in the felony-murder, murder situation. The law sanctions felony murder and outright murder charges, and a single trial upon both charges, even though they are based upon the same death. But the bar against multiple punishments for the same offense bars separate convictions and sentences upon both. Here, the victim thankfully did not die. But the fact that we deal here with the same injuries and not the same death, does not provide a principled basis for distinction of the two situations. There was only one quick and confined multiple stabbing. Appellant cannot be punished twice for it.

We therefore hold that Appellant's convictions and sentences for both class A burglary and attempted murder cannot stand. It is clear that burglary charge in Count II contained a class B burglary charge, and the jury was so instructed. The verdict of guilty of class A burglary included a verdict of guilty of class B burglary as well. On this issue we remand with instructions to vacate appellant's conviction and sentence for class A burglary and to enter a conviction and sentence for class B burglary in its stead. In all other

regards the convictions and sentences are affirmed.

GIVAN, C.J., and HUNTER and PRENTICE, JJ., concur.

PIVARNIK, J., concurring and dissenting with opinion.

PIVARNIK, Justice, concurring in part and dissenting in part.

I concur in this opinion with the exception of the majority's position in Issue IV, concerning the prohibitions of the Indiana Constitution, Art. I, § 14, and the 5th Amendment of the U.S. Constitution against multiple punishments for the same offense.

Appellant was convicted of attempted murder of the victim by cutting and stabbing her with a knife. He was also convicted under Count II of Class A felony burglary which was elevated from Class B to Class A because he had inflicted injury upon the victim during the burglary. The injury used for finding the class A felony burglary was the same stabbing and cutting with a knife used in the conviction for attempted murder. It is the holding of the majority that this violated the double jeopardy provision of the Fifth Amendment to the U.S. Constitution and the corresponding provisions of our Indiana Constitution because it twice punished the defendant for the same act. I suggest this is the wrong test to apply in making a determination of double jeopardy. The focus of the double jeopardy inquiry is directed to whether the person is being punished for the same offense and not on the identity of its source. In *Elmore v. State*, (1978) 269 Ind. 532, 382 N.E.2d 893, this Court cited *Blockburger v. U.S.* (1932) 284 U.S. 299, 304, 52 S.Ct. 180, 182, 75 L.Ed. 306, 309, as follows:

"In holding that under the *Blockburger* test a lesser included offense is the same as the greater offense, the *Brown* court stated: 'This test emphasizes the elements of the two crimes.'" "If each requires proof that the other does not, the *Blockburger* test would be satisfied, notwithstanding a substantial overlap in

the proof offered to establish the crimes...." *Ianelli v. U.S.*, (1975) 420 U.S. 770, 785, N. 17, 95 S.Ct. 1284, [1293, n. 17] 43 L.Ed.2d 616; and *Gore v. U.S.* (1958) 357 U.S. 386, 78 S.Ct. 1280, 2 L.Ed.2d 1405.'"

We further stated in *Elmore:*

"The focus of a proper double jeopardy analysis must be on whether or not the offenses to be prosecuted and punished are the same, and not whether the offenses spring from the same act or operative circumstances. The inquiry into whether the offenses stem from the same act is merely the first step in the analysis. If the offenses are premised upon different acts, the problem is not so great. But where they do arise from the same act, we must proceed to determine whether the offenses charged are themselves the same, for the Double Jeopardy Clause was written in terms of the "same offence," not the same act. In other words, the fact that the offenses stem from the same act merely informs us that there is a potential problem; it is not a solution to the problem. The ultimate focus is on the identity of the offenses, not on the identity of the source."

The analysis used by the majority of felony murder and class A murder is not a proper analysis here. Felony murder and class A murder are the same offense, that is, murder. Not only are they based on the same acts of the defendant but they name the same offense. In the instant case that is not so. The only relationship between these two crimes, attempted murder and class A burglary, is the one single act of inflicting injury by stabbing with a knife. The offenses are distinct, separate, and require additional facts in each case for conviction and sentencing.

It is my view there was no violation of the double jeopardy prohibition by finding Defendant guilty and sentencing him for both attempted murder and class A felony burglary. Accordingly, I would affirm the trial court in this issue as well as all others.